**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **COLLEEN G.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23 C 0357** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff filed her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, almost three years ago in December 2020. (Administrative Record (R.) 200-01). She claimed that she had been disabled since October 15, 2020, due to: "Fibromyalgia, Cervical dystonia, Diverticulitis, Chronic Kidney Disease/Proteinuria with singular kidney, Generalized anxiety disorder and cognitive problems, Chronic left foot and ankle pain, Depression, Osteoarthritis and joint pain, Chronic fatigue/sleeplessness, Chronic lower back pain." (R. 231). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. She filed suit in federal district court on January 20, 2023, and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on January 27, 2022, and the Executive Committee reassigned the case to me. [Dkt. ##7, 8]. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955;

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

404.981. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "fibromyalgia; migraines; and degenerative disc disease of the cervical spine" (R. 13). The ALJ said the plaintiff's hypertension, stage three chronic kidney disease, depression, and anxiety were not severe impairments. (R. 13-14). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on Listings 1.15, 11.02, 12.04, 12.06, and 14.09D. (R. 19-20). The ALJ found that the plaintiff had no limitations in understanding, remembering or applying information, and mild limitations in concentrating, persisting or maintaining pace; in interacting with others; and in adapting or managing oneself. (R. 15-16).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform medium work – lifting up to fifty pounds and frequently lifting or carrying up to twenty-five pounds – with the following additional limitations:

> she can occasionally climb ramps and stairs but can never ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, crawl. She can frequently reach in all directions including overhead with both upper extremities and frequently handle, finger, and feel with both upper extremities. She can tolerate occasional exposure to and can occasionally work around vibration and hazards such as moving machinery or unprotected heights.

(R. 20). The ALJ then summarized the plaintiff's allegations, noting that the plaintiff explained that

she had to finally stop working due to an accumulation of symptoms from all her impairments (R. 21): Her cell phone was heavy to hold with her hands, so she kept it in a pouch hung around her neck; she could lift about five pounds and had trouble using her hands and arms for more than about five minutes due to pain. Pain also limited her standing, sitting, and sleeping. (R. 21). The ALJ noted that plaintiff said she suffered from migraines and locking in her jaw and neck. She was limited in the kinds of medications she was able to take due to the loss of one kidney and various side effects. (R. 21). The plaintiff explained that her daughter took care of plaintiff's autistic son and helped with plaintiff's husband, who had encephalitis and suffered bouts of pneumonia and covid. Plaintiff avoided doctors' appointments because of her husband's weakened immune system. She drove only during the day due to poor night vision and read and watched a little TV. (R. 22). The ALJ then concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 22). The ALJ said that there was "nothing in the hearing level record, which would preclude her from performing medium exertional work on a sustained basis with the indicated additional limitations . . . ." (R. 22).

The ALJ went on to summarize the medical evidence. She noted that despite a September 2020 diagnosis of synovitis of right ankle and right medial tibial stress syndrome, and a November 2020 x-ray showing mild to moderate spondylosis and degenerative disc change most pronounced at C5-C6 and C6-C7, clinical exams showed normal gait and motor strength. (R. 23). A consultative exam in May 2021 revealed tenderness in both sides of the neck. She was able to stand

on one foot with mild difficulty and had a non-antalgic gait.  Grip strength and manipulative ability were noted to be normal.  Although range of motion was normal, there was tenderness along the lumbar spine and 12 of 18 trigger points confirming a diagnosis of fibromyalgia. (R. 23-24).  The ALJ noted continued treatments for hand, wrist, and neck issues.  (R. 24).  In November 2021 plaintiff's rheumatologist noted overall body pain due to fibromyalgia.  The ALJ noted plaintiff had stopped taking medications other than opioids for pain. (R. 24). The doctor treating plaintiff for migraines noted that a September 2020 MRI of plaintiff's brain confirmed white matter changes. (R. 25).

The ALJ then moved on to the medical opinion evidence.  The ALJ rejected the consultative examiner's finding that plaintiff could "stand, walk and sit" because there was no indication of how long she could do these things. The ALJ further rejected the consultative examiner's finding that plaintiff could lift no more than eight pounds or only slowly climb stairs because the examiner noted plaintiff's motor strength to be five out of five.  (R. 25).  The ALJ found the opinions of both state agency reviewing physicians that the plaintiff did not have a severe physical impairment "somewhat persuasive," explaining that hearing level evidence supported some workplace limitations. (R. 25). The ALJ found the opinion from plaintiff's treating rheumatologist that she had a number of physical limitations mostly due to fibromyalgia was not supported by the overall record.  The ALJ noted that the doctor saw plaintiff only twice a year and that clinical exams were within normal limits and plaintiff was resistant to treatment.  (R. 26).

The ALJ then explained that the plaintiff's allegations of disabling pain were inconsistent with several examinations indicating she was in no acute distress and having a normal gait without assistive devices.  The ALJ added that the plaintiff had stopped taking her medications months ago

4

and that her rheumatologist expressed the opinion that the plaintiff has a "poor prognosis of fibromyalgia because she is resistant to treatment." (R. 27). The ALJ then stated that plaintiff's severe impairments "do not preclude her from completing basic work-related activities on a sustained basis" and the residual functional capacity for medium work with some additional limitations was supported by examination and evaluation reports by treating doctors, consulting doctors, medical examiners, and the [plaintiff's] testimony." (R. 27).

Finally, the ALJ relied on the testimony of the vocational expert that someone with the plaintiff's residual functional capacity would be able to perform her past work as a nanny and a home health aid. Accordingly, the ALJ found the plaintiff not disabled and not entitled to disability benefits under the Act. (R. 28).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by

reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record.");

*Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record."). *See also Joseph M. v. Kijakazi*, No. 23 C 0088, 2023 WL 7167523, at *1 (N.D. Ill. Oct. 31, 2023).

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2] In this case, however, the ALJ did not

---

[2] Prior to Sarchet's "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better
>
> (continued...)

do enough to build a "logical bridge" from the evidence to her conclusion that the plaintiff could perform medium work caring for children or the infirm or the elderly.

### III.

The plaintiff has some issues with the manner in which the ALJ got from the evidence in this case to her conclusions that the plaintiff can perform medium work – lifting up to 50 pounds and frequently carrying 25 pounds – with absolutely no mental limitations. After a review of the record and the ALJ's decisions, the plaintiff's concerns are understandable, and this case has to be remanded to the Commissioner.

As just discussed, "logical bridges" aren't one-size-fits-all. Some reviewers demand more explanation than others, and each reviewer in federal court is reviewing the ALJ's decisions de novo. So, for example, in a recent Seventh Circuit opinion, two judges on the panel needed more of an explanation from an ALJ, *Jarnutowski*, 748 F.4th at 774-77, while the third judge on the panel, who dissented, thought the ALJ's explanation of her reasoning was adequate. *Jarnutowski*, 48 F.4th

---

[2](...continued)
opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

777-79. And, the Magistrate Judge who reviewed the ALJ's opinion below was able to follow the ALJ's reasoning as well. *See Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *1 (N.D. Ill. June 1, 2021). In terms of what constitutes an adequate "logical bridge," every *de novo* reviewer is different, even though the literal standard does not vary.

And every medical record is different. Some depict young people, inexperienced in the demands of work, who are troubled by no more than a couple of mild impairments. Records like those allow a court, without lengthy explanation, to follow the reasoning of an ALJ, who finds such an individual able to work on a daily basis. That's one end of the spectrum. In those cases, there is not much of a "bridge" needed to make it from one side to the other, and review is not difficult. Again, it's not a one-size-fits-all proposition. But, this case is not at that end of the spectrum. Given the medical record here and the ALJ's conclusion much more of a "bridge" was needed to get a reviewing court all the way to "medium work."

### A.

The plaintiff was born on March 14, 1967 and was 55 years old at the time of the ALJ's decision. (R. 34, 200-01). She last worked in October of 2020, caring for her autistic son, for which the State of Illinois paid her. (R. 49). She was a nanny for a family for several years prior to that. (R. 50). Over the years, however, she accumulated impairment after impairment until, finally, she says she can no longer even manage caring for her autistic son on her own. For example, she has protruding discs at multiple levels of her spine. Back in August of 2011, a CT scan of her lumbar spine revealed a moderate antral disk protrusion at L4-L5 and mild bulge possibly small left posterolateral HNP at L5-S1. (R. 2167). In November 2018, an MRI showed a small diffuse disc bulge and annular fissure at L4-5 with mild facet arthropathy (R. 2392). Then, in September 2019,

an MRI of the thoracic spine showed another central disc protrusion at the level of T7-T8 with effacement of the ventral thecal sac and mild ventral cord deformity, with mild associated canal stenosis. (R. 2470).

Not long after that, plaintiff's neck became affected. An April 2020 cervical spine MRI showed a mild reversal of the normal lordotic curvature of the cervical spine, along with mild multilevel disc narrowing and desiccation; facet and prominent right uncovertebral hypertrophy resulting in mild to moderate right foraminal encroachment at C3-C4 and C4-C5; broad-based central posterior disc protrusion displacement of disc material posterior to the disc space resulting in effacement and flattening of the ventral cord and mild focal central canal stenosis at C5-C6; a shallow broad-based central posterior disc protrusion measuring 2.5 mm AP with resultant effacement of the ventral thecal sac patent neural foramina, and a central posterior annular tear at C6-C7. (R. 2500-01).

In addition to the pain and radiculopathy that might be expected from all that, in March 2014 she was diagnosed with "Classic" fibromyalgia (R. 2471). So, that's yet another source of pain. She also has migraines, and her jaw locks from cervical dystonia, which cause neck muscles to spasm. (R. 62). She was also diagnosed with diverticulitis in 2018 (2422, 2522, 2525), which causes diarrhea, mostly in the mornings. And, she has one kidney, which, combined with her diverticulitis, limits the type of medications she can take to manage all her issues and adds to medication side effects. (R. 62-64, 1340, 2168, 2192, 2207, 2230, 2231, 2233, 2321).

On top of all that, she understandably has psychological issues, causing her to be depressed, anxious, and tearful. (R. 2509, 2014, 2518, 2525, 2530). In addition to all her ailments, her husband has been diagnosed with encephalitis, and they are dealing with his early memory loss. (R. 2471).

10

He was hospitalized for a lengthy period, and as his immune system was comprised, plaintiff limited her contact with healthcare providers, especially during the pandemic. (R. 53).

At her administrative hearing, the plaintiff explained that her pain limited much of what she could do. Even her cell phone felt heavy, although she could use it to text. (R. 61). She said she could only lift about 5 pounds due to pain in her hands (R. 66). Pain in her arms meant she could only do things like washing dishes for a few minutes at a time. (R. 67). Whether she was sitting or standing, she had to alternate about every five minutes. (R. 68). She was only able to sleep a couple of hours due to pain, and would switch from bed to a cot to mat on the bathroom floor in an attempt to get comfortable. (R. 68). With plaintiff so limited, her daughter took over caring for her autistic brother and was helping out her father as well. (R. 51).

Obviously, that's quite a lot. But, the ALJ nonetheless decided that the 55-year-old plaintiff with multiple bulging discs up and down her spine, fibromyalgia, diverticulitis, and one kidney could do medium work eight hours a day, five days a week. That means lifting up to 50 pounds and carrying 25 pounds frequently – one-third to two-thirds of every day – and standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. *Jarnutowski*, 48 F.4th at 772; SSR 83-10, 1983 WL 31251, *6. It's difficult to get from 55 years old, several bulging discs, fibromyalgia, diverticulitis, and one kidney all the way to six hours of walking and carrying twenty-five pounds around every day without a rather substantial "logical bridge." This is not a case where a reviewer looks through the evidence, reads an ALJ's decision, and immediately says, "yes, I can see that."

Just imagine carrying a case of beer around for six hours a day, day after day. Then imagine

11

doing it with a half-dozen bulging discs and overall body pain from fibromyalgia. And you are not sleeping a full night and are plagued by bathroom issues. And you can't take NSAIDs because you have lost a kidney – and some other drugs you might take exacerbate your diverticulitis. Could the plaintiff do such strenuous work? What the Seventh Circuit said in another case last year applies here just as well: "Possibly. But we cannot reach that conclusion from the ALJ's analysis. The ALJ did not explain how [the plaintiff] could lift and carry up to 50 pounds and frequently lift or carry objects weighing up to 25 pounds." *Jarnutowski*, 48 F.4th at 774–75.

Or, perhaps more to the point – and if one is past the case-of-beer stage of life – just imagine carrying a two-year-old child around for six hours every day. That's the kind of work the ALJ thought the plaintiff could do every day. The ALJ said the plaintiff could still do her past work as a nanny or a home aide, taking care of young children or the elderly. Anyone who has done either or both *without* bulging discs, fibromyalgia, diverticulitis, etc., would, at the very least, raise an eyebrow at the ALJ's conclusion. Here is a brief description of the duties of a home aide from the Dictionary of Occupational Titles because the innocuous sounding title, "home aide," doesn't do the job's demands justice:

> Cares for elderly, convalescent, or handicapped persons in patient's home, performing any combination of following tasks: Changes bed linens, washes and irons patient's laundry, and cleans patient's quarters. Purchases, prepares, and serves food for patient and other members of family, following special prescribed diets. Assists patients into and out of bed, automobile, or wheelchair, to lavatory, and up and down stairs. Assists patient to dress, bathe, and groom self. Massages patient and applies preparations and treatments, such as liniment or alcohol rubs and heat-lamp stimulation. Administers prescribed oral medications under written direction of physician or as directed by home care nurse. Accompanies ambulatory patients outside home, serving as guide, companion, and aide. Entertains patient, reads aloud, and plays cards or other games with patient. Performs variety of miscellaneous duties as requested, such as obtaining household supplies and running errands. May maintain records of services performed and of apparent condition of patient. May

visit several households to provide daily health care to patients.

https://occupationalinfo.org/35/354377014.html; #354.377-014. This description of the job makes it a good deal more taxing than the shorthand of "medium work" might suggest. And, again, it is nearly impossible to imagine someone plaintiff's age, with all her maladies, getting up every day (after pain-interrupted sleep) and doing it every day for eight hours. So, this is a case that requires more explanation of how the ALJ got from the evidence to her conclusion. Or in the more commonly used parlance – more of a "logical bridge" – than courts might usually be satisfied with in other cases.

To begin with, in order to get to the end point of medium work, the ALJ had to gloss over a bit of the medical record.[3] An ALJ doesn't have to mention every piece of evidence, but she can't ignore lines of evidence that go against her conclusions. *Grotts*, 27 F.4th at 1278; *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The ALJ briefly mentioned the bulging discs in plaintiff's cervical and lumbar spines – albeit missing the mild to moderate right foraminal encroachment at C3-C4 and C4-C5 – but ignored the bulging discs in her lumbar spine. (R. 22). That's three bulging discs the ALJ didn't consider. That's not too bad and perhaps an argument can be made that one or two more bulging discs on the pile wouldn't change the outcome.

Making things a bit worse, however, was the ALJ's take on plaintiff's diverticulitis. The ALJ didn't think it was a severe impairment, explaining that "[t]he medical documentation as of the alleged onset date does not establish this diagnosis as medically determinable impairment." (R. 14).

---

[3] As seems *de rigueur* in Social Security disability cases, the medical record here was lengthy– over 2200 pages – and disorganized. The ALJ had some issues going through it (R. 44-49, 53, 56-57, 58) and the court can't say it blames her.

That's despite a January 2019 colonoscopy which showed *extensive* diverticulosis of the descending and sigmoid colon.[4] It was bad enough that the doctors told plaintiff she could have a colonic rupture and should consider an elective partial colectomy. (R. 2410, 2422, 2522, 2525). The Commissioner's regulations tell us that a medically determinable impairment results "from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. Extensive diverticulosis established by a colonoscopy and the threat of perforation and consideration of surgical removal of part of plaintiff's colon would seem to qualify as a medically determinable impairment and one that sounds quite severe.

Plaintiff's diverticulitis is a significant factor in this case because, along with her lost kidney and the restraints of health insurance, it prevents her from taking any number of medications that might help with her overall pain. She cannot take NSAIDS, and her insurance would not cover topical pain relief ointments. (R. 1980, 1982, 2008, 2010, 2117, 2188, 2454, 2596). Lyrica would likely be effective but, again, the insurance company would not pay for that either. (R. 1433, 1478, 1980, 2117, 2095, 2330). It would seem that insurance company decided that plaintiff's doctors did not prescribe a high enough dosage of Gabapentin for it to be effective and so would not allow the much more costly Lyrica. (R. 2227, 2232). Norco was effective, but caused side effects due to plaintiff's diverticulitis. (R. 247, 550, 2315, 2540, 2546). The ALJ mentioned side effects of

---

[4] Diverticulosis occurs when small, bulging pouches (diverticula) develop in the digestive tract. When one or more of these pouches becomes inflamed, the condition is referred to as diverticulitis. https://www.mayoclinic.org/diseases-conditions/diverticulitis/multimedia/diverticulosis-and-diverticulitis/img-20006098.

medication only briefly, in connection with a Botox trial for plaintiff's migraines and plaintiff's doctor noting dizziness and concentration difficulties. (R. 25, 26). The ALJ made no mention at all of any insurance issues. As such, the ALJ failed to properly consider the reasons for plaintiff's supposed "resistance" to treatment. *See* SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). That failure is underscored because the ALJ used plaintiff's insurance and side effect issues against her when providing the required "narrative discussion" of how the evidence supports her conclusions. (R. 27); see SSR 96-8p, 1996 WL 374184, *7.

In addition to plaintiff's medication issues, the ALJ relied on several reports of plaintiff being in "no acute distress" and her being able to ambulate without assistive devices. (R. 27). Obviously, neither of those observations provides an adequate basis in this case for an RFC of medium work or for dismissing the plaintiff's complaints of pain. First of all, "no acute distress," especially when a patient suffers from a number of chronic conditions, is the thinnest of reeds on which to build a rejection of a plaintiff's complaints. "To physicians, "No Acute Distress" means that your patient will probably not become unstable in the next 5 minutes." Dave Chauvin, DO, and Lisa Hohler, CP, "Physician Documentation - No Acute Distress", https://www.lb7.uscourts.gov/documents/18-1285URL1Noacutedistress.pdf; *see also John B. v. Kijakazi*, No. 20-CV-50137, 2023 WL 4762602, at *7 (N.D. Ill. July 26, 2023)("While a number of courts have found 'a finding of "no acute distress"' [to be] a relevant factor for an ALJ to consider in a symptom evaluation, especially when accompanied by other findings,". . . , others have found ALJs to have 'read too much into the notations that [a claimant] did not appear to be in acute distress' since the term 'refers to a disease, health effect, or symptom having a sudden, abrupt onset

15

and a short, but severe, course, as opposed to a chronic condition or symptom having a slow development and a protracted but mild course.'"); *Brenda L. v. Kijakazi*, No. 3:21CV859, 2022 WL 2763561, at *8 (N.D. Ind. July 15, 2022)("'No acute distress' generally means that the patient is conscious, not bleeding profusely, not struggling for breath, and other things of that nature indicating that the patient is not in need of immediate emergency care."). Moreover, the examination notes from those "no acute distress" days prove this point by cataloging many complaints and issues. *See* n. 4, below, collecting observations contained in the notes.[5]

The ALJ also pointed to exam notes saying that plaintiff had a normal gait without assistive devices. (R. 27). But, obviously, the plaintiff's "ability to walk is not enough to show that she can perform medium work." *Jarnutowski*, 48 F.4th at 775. Moreover, the plaintiff never said she was unable to walk without an assistive device. She said she couldn't go down stairs at times, and could stand for only about five minutes (R. 21, 67-68) and could not walk without pain. (R. 21, 247). Walking across an exam room disproves none of those claims. *See, e.g., Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("Scott successfully walked 50 feet without a cane within the confines of

_____

[5] November 12, 2020 – fell and hit her head, suffering a concussion, severe neck pain the day before, mild dizziness, elevated blood pressure (R. 2005-06, 2009); October 13, 2020 – chest pain on exertion and swelling in the extremities, frequent severe headaches, depression, anxiety, insomnia, abdominal pain, heartburn, constipation, leg and arm weakness (R. 2076, 2081); September 21, 2021 – left leg pain with numbness and tingling in her feet, left wrist pain (extremely tender, referral to hand surgery), chronic low back pain getting worse with lumbar radiculopathy (R. 2454); November 8, 2021 – husband diagnosed with terminal illness, suffering severe anxiety, insomnia, panic attacks (R. 2456), fatigue, decreased concentration, dysphoric mood, sleep disturbance (R. 2459), poor affect, crying (R. 2460); June 10, 2021 – generalized pain and aches from fibromyalgia, pain in low back and thigh, neuropathic pain in feet, living with pain, having cognitive and memory issues, active diverticulitis with abdominal pain getting better, constipation (R. 2540, 2546), Chest pain on exertion, swelling in extremities, pain in feet and ankles, abdominal pain due to diverticulitis, left ankle pain goes up to knee at times, frequent severe headaches, depression, anxiety, insomnia (R. 2547); January 4, 2022 – continues to complain of generalized pain and aches, pain in low back and thigh, neuropathic pain in feet, active bout of diverticulitis, cognitive and memory issues (R. 2556); February 11, 2022 – right side chest wall tenderness (R. 2635).

her office, but that brief excursion hardly demonstrates an ability to stand for 6 hours (and neither does Scott's testimony that she could walk 2 blocks)."); *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) ("The ALJ overstated findings from three diagnostic tests to discredit Gerstner's complaints ... [Gerstner never claimed] that her condition totally impaired the abilities tested in these exams. Instead, she said that her pain was triggered by prolonged sitting, standing, or activity and stress."); *Murphy v. Colvin*, 759 F.3d 811, 818-19 (7th Cir. 2014) ("Dr. Mayer noted that Murphy's gait and tandem gait had returned to normal, but that description is not informative as to whether Murphy could perform light work.").

**B**.

So, this case has to be remanded for the ALJ to provide more of a "logical bridge" explaining how the plaintiff is capable of the physical demands of medium work and a daily basis. But, there are some issues with the mental demands of the jobs the ALJ said the plaintiff can do – nanny and home aide – as well.

As noted earlier, the ALJ found that the plaintiff had mild limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (R. 15-16). As a result, she concluded the plaintiff did not meet the listings for mental impairments and that, as her limitations were no more than minimal, she did not have a severe mental impairment. (R. 15-17). The ALJ then went on to fashion her residual functional capacity finding, which included no mental limitations, mild, minimal, or otherwise. So, the question is, where did the mild limitations go?

It's a question courts find themselves asking from time to time. At point A, an ALJ finds a plaintiff has two or three mild limitations. At point B, that same ALJ finds that same plaintiff has

no limitations at all. Again, where do the mild limitations go? The Commissioner has no answer, but does offer that the ALJ's finding of mild limitations logically leads to his finding of no severe mental impairment, because mild limitations have no "more than minimal limitation on her capacity for basic work." [Dkt. #14, at 3-4]. And, the Commissioner adds that there's a "logical bridge" to the ALJ's non-severe impairment finding from the opinions of the two state agency reviewing psychologists, who said the plaintiff had no severe mental impairment. [Dkt. #14, at 4-5].[6]

Perhaps, but an ALJ has to consider the effects of even *non-severe* impairments on a plaintiff's overall capacity to work. 42 U.S.C. § 423(d)(2)(B)("... the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."). *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014)(ALJ improperly failed to consider non-severe headaches in combination with plaintiff's other impairments); *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014). In *DeCamp*, for example, the ALJ found the plaintiff limited to unskilled work with no fast-paced production line or tandem tasks, despite finding the plaintiff had moderate limitations in some areas and mild limitations in others. But because the ALJ's hypothetical and RFC "omitted any mention" of those limitations, the court found "[t]he ALJ's analysis ... flawed with respect to [plaintiff's] *mild* limitations in understanding, remembering, and carrying out simple instructions and her moderate limitations in concentration,

---

[6] The ALJ accepted the reconsideration reviewing psychologist's findings of mild limitations in interacting, concentrating, and adapting, but rejected her finding that plaintiff also had a mild limitation in understanding. (R. 105-06, 18). The ALJ agreed with the initial reviewing psychologist that plaintiff had no limitation in understanding, and mild limitations in interacting, concentrating, and adapting. (R. 91, 18). It's unclear why the ALJ thought the initial reviewing psychologist's take was better than the reconsideration psychologist' take, as the ALJ provides no explanation. (R. 18).

persistence, and pace...." *DeCamp*, 916 F.3d at 675–76 (emphasis added).

The Commissioner points out that all an ALJ has to do is *consider* non-severe impairments when fashioning an RFC finding; he doesn't have to find they cause work restrictions. *See, e.g.,* 20 C.F.R. § 404.1545(a)(2)("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . ."). Fine, but when, exactly, did the ALJ consider them in her Opinion? At the conclusion of her "Paragraph B" discussion, the ALJ employed the ubiquitous boilerplate that reviewing courts know by heart:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(R. 18-19). But, there was no "more detailed assessment" of plaintiff's mental residual functional capacity thereafter. There was no mention of any of the mild limitations the ALJ said the plaintiff had. That seems to be the case from time to time. *See, e.g. Dianne O. v. Kijakazi*, No. 21 C 2348, 2023 WL 3864589, at *3 (N.D. Ill. June 7, 2023)("Despite the ALJ's acknowledgment that the RFC required "a more detailed assessment, the ALJ's RFC analysis did not include one.")(Jantz, M.J.); *Joanne Y. v. Kijakazi*, No. 21-CV-1050, 2023 WL 3389367, at *5 (N.D. Ill. May 11, 2023)(". . . the ALJ's statement that the RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" is precisely the type of language that courts in the Seventh Circuit find cause confusion.")(Cummings, M.J.); *Judy M. v. Kijakazi*, No. 21 C 2028, 2023 WL 2301448, at *5 (N.D. Ill. Feb. 28, 2023)(". . . while the ALJ's step two analysis does state that the 'following residual functional capacity assessment reflects the degree of limitation the

undersigned has found in the 'paragraph B' mental function analysis,' courts in this district have found this language to be 'boilerplate' that is 'insufficient to properly account for mild mental limitations without a more thorough discussion when crafting the RFC.' Although Judy M.'s mild limitations may not have required accommodation, as the Commissioner argues, the ALJ was at least required to explain why that is the case.")(Ellis, J.); *Stephanie D. L. v. Kijakazi*, No. 22 C 1563, 2023 WL 1475119, at *3 (N.D. Ill. Feb. 2, 2023)("But the RFC the ALJ subsequently fashioned does not account for any mental limitations. Moreover, the ALJ does not even mention those limitations, let alone explain why there was no need to account for them, in her explanation of the RFC."); *Jilian H. v. Kijakazi*, No. 20-CV-06489, 2022 WL 4554451, at *4 (N.D. Ill. Sept. 29, 2022)("Yet the ALJ never conducted the promised 'more detailed assessment.'")(Wood, J.); *Benjamin G. v. Kijakazi*, No. 19 CV 04558, 2022 WL 2208865, at *4 (N.D. Ill. June 21, 2022)("At the end of his paragraph B analysis of Plaintiff's mental impairments, the ALJ included boilerplate language that his RFC assessment 'reflects the degree of limitation the undersigned has found in the paragraph B mental functional analysis.' However, the ALJ failed to incorporate Plaintiff's moderate limitation in maintaining concentration, persistence, and pace into his RFC, nor did he offer any explanation for omitting these limitations.")(McShain, M.J.); *Anthony W. v. Kijakazi*, No. 20 C 6209, 2022 WL 1062334, at *3 (N.D. Ill. Apr. 8, 2022)("In the present case, the Court cannot discern what the ALJ intended to convey when she wrote this boilerplate language at the end of her step two analysis. What is evident, however, is that the ALJ did not offer a more detailed RFC assessment that included the functional limitations she found, as she was required to do.")(Harjani, M.J.); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *23 (N.D. Ill. Nov. 18, 2011)(". . . the ALJ failed to clarify whether the functional limitations that were found to exist at Step 2 were included in the

RFC. On the one hand, neither the RFC nor the discussion that supports it cites Ms. Muzzarelli's mild limitations in these areas. On the other hand, the ALJ concluded his analysis of the special technique at Step 2 by stating: 'Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis.' It is unclear what the ALJ meant by saying that the RFC 'reflects' his Step 2 findings concerning Ms. Muzzarelli's mental limitations.")(Schenkier, M.J.).

As the parties' briefs in situations like these demonstrate, cases in this District can go either way on whether an ALJ can find a mild restriction in one breath and somehow translate that into no restriction at all in the next breath. That's a by-product of the "logical bridge" requirement which, again, is somewhat subjective. Sometimes a court can follow the ALJ's reasoning from a mild restriction to no restriction. *See, e.g., Tina W. v. Kijakazi*, No. 20 C 6311, 2023 WL 4053818, at *6 (N.D. Ill. June 16, 2023)(affirming the ALJ's decision that the plaintiff had mild mental impairments that did not require limitations in the RFC as supported by "substantial evidence" where the ALJ adequately considered plaintiff's mild mental limitations, but determined, with support of the state agency medical consultant and no contradictory evidence, that those limitations did not support a functional limitation in the RFC); *Michael Z. v. Kijakazi*, No. 20-CV-6857, 2023 WL 3885882, at *11 (N.D. Ill. June 8, 2023)(given the ALJ's discussion of medical records from two doctors, the court found the ALJ had "sufficiently explained her decision not to incorporate any non-exertional limitations into the RFC to account for plaintiff' mild mental impairments"); *Rick M. v. Saul*, No. 20 CV 4369, 2021 WL 2588762, at *5 (N.D. Ill. June 24, 2021)(explaining that while "the ALJ could have been more explicit about why he omitted mental limits from [plaintiff's] RFC," the ALJ was only "required to consider those limitations, not necessarily to include them in his finding of

plaintiff's RFC."). Sometimes, it's a bridge too far. *See, e.g., Milton B. v. Kijakazi*, No. 20-CV-5482, 2023 WL 4134812, at *7 (N.D. Ill. June 22, 2023)(remanding where the ALJ failed to mention his finding that [plaintiff] had mild limitations in his ability to understand, remember, or apply information and to concentrate, persist, or maintain pace in his discussion of his RFC assessment" or "provide any explanation as to why he failed to include any non-exertional limitations in the RFC to address [plaintiff's] mild mental limitations."); *Dianne O.*, 2023 WL 3864589, at *4 (remanding where "the ALJ determined at step two that Plaintiff had non-severe mental impairments that warranted a mild limitation in adapting or managing herself, but the ALJ failed to discuss or even mention Plaintiff's mild mental limitation in crafting the RFC."); *Brenda R. v. Kijakazi*, No. 20-CV-7498, 2023 WL 3689458, at *6 (N.D. Ill. May 26, 2023)(remanding where "the ALJ made no mention in his RFC assessment of his own findings that [plaintiff] has mild limitations in her ability to concentrate, persist, or maintain pace; interact with others; and adapt and manage herself, nor did he sufficiently explain why he did not include any such limitations. The ALJ's failure to do so is particularly troubling here where the determination of non-disability was based on the ALJ's finding at step four that [plaintiff] had the ability to perform her past skilled work as department manager); *Thomas D. v. Kijakazi*, 605 F. Supp. 3d 1063, 1068 (N.D. Ill. 2022)(remanding where "the ALJ failed to account for the mild functional limitations caused by the mental impairments in forming the RFC" and "failed to explain why the limitations he found credible at step two would not impact [Plaintiff's] ability to work.").

It's a bridge too far in this case. Dropping the mild restrictions without a word makes a significant difference in this case because of the type of work the ALJ decided the plaintiff could do. Take another look at that definition of home aide from the DOT. *Supra*, at 11-12. Does that sound

like something a person with even a mild limitation in interacting with others could do? Does taking care of children sound like something they could do? It's possible, but not without some fairly detailed explanation of how from an ALJ. Indeed, the Dictionary or Occupational Titles sets out social interaction in one way or another as a main aptitude or interest or activity involved in both the home aide and nanny positions. It's rated on a scale of 1 to 100 in terms of what those jobs involved again and again, and it's always in the 80s and 90s.[7] At the very least, the vocational expert ought to have been given an opportunity to weigh in on that limitation before testifying that the plaintiff could care for elderly or convalescent people and children on a daily basis.[8] It's possible that a person with such a limitation could do so, but because the ALJ edited that from her hypothetical and

---

[7] Home Aide: 88 Customer and Personal Service (Knowledge of principles and processes for providing customer and personal services including needs assessment techniques, quality service standards, alternative delivery systems, and customer satisfaction evaluation techniques); 83 Service Orientation (Actively looking for ways to help people); 96 (I) Provide a Service to Others (How important are interactions requiring the worker to: Provide a service to others (e.g., customers)?); 90 (C) Job-Required Social Interaction (How much does this job require the worker to be in contact (face-to-face, by telephone, or otherwise) with others in order to perform it?); 89 Social (Social occupations frequently involve working with, communicating with, and teaching people. These occupations often involve helping or providing service to others). https://occupationalinfo.org/onet/66011.html. Nanny: 96 Customer and Personal Service (Knowledge of principles and processes for providing customer and personal services including needs assessment techniques, quality service standards, alternative delivery systems, and customer satisfaction evaluation techniques); 100 Assisting and Caring for Others (Providing assistance or personal care to others); 80 Establishing and Maintaining Relationships (Developing constructive and cooperative working relationships with others); 90 (C) Job-Required Social Interaction (How much does this job require the worker to be in contact (face-to-face, by telephone, or otherwise) with others in order to perform it?); 84 (I) Provide a Service to Others (How important are interactions requiring the worker to: Provide a service to others (e.g., customers)?); 89 Social (Social occupations frequently involve working with, communicating with, and teaching people. These occupations often involve helping or providing service to others). https://occupationalinfo.org/onet/62041.html.

[8] The Commissioner argues that any error in failing to account for the plaintiff's mental limitations was harmless because the ALJ did posit mental limitations to the vocational expert and the vocational expert testified that there would still be jobs the plaintiff could do. [Dkt. #]. And, indeed, the ALJ did ask whether a restriction to "simple, routine tasks requiring no more than short, simple instructions" would rule out work. But, without some explanation, it is not clear how such a restriction accounts for a difficulty with social interaction.

RFC, we don't know.  So, again, this case has to be remanded to the Commissioner.

**C.**

It is perhaps not an exaggeration to conclude that the record in this case was a mess, and that the ALJ had a lot of disorganized evidence to wade through. And the court understands that it's perfectly acceptable to summarize evidence and not microscopically examine the evidence on every page. But "an ALJ's RFC analysis must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Jarnutowski*, 48 F.4th at 774.  "Substantial evidence" review is deferential and the "logical bridge" requirement is both subjective and flexible, so courts might carry a little water for an ALJ here and there if the record allows and the ALJ's logical gaps are not too wide or too many.  But, here, especially given the constellation of medical issues the plaintiff had and the ALJ's conclusion that she could do medium work with absolutely  no mental restrictions, the court is asked to do at least medium work – if not heavy – on behalf of the ALJ to fill in the gaps necessary to get to her conclusion.  And, that's too much.

**CONCLUSION**

For the foregoing reasons, this case is remanded to the Commissioner for further proceedings.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/19/24